IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| MICHELLE IMHOF,<br><br>          Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>          Defendant. | CASE NO. 5:24-cv-1579<br><br>DISTRICT JUDGE<br>CHRISTOPHER A. BOYKO<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Michelle Imhof filed a Complaint against the Commissioner of Social Security seeking judicial review of its decision denying her application for Disability Insurance Benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court remand the ALJ's decision.

**Procedural Background**

In March 2022, Imhof filed an application for Disability Insurance Benefits, alleging a disability onset date of January 2021.[1] Tr. 200. Imhof alleged disability relating to COVID-19, fibromyalgia, post viral fatigue

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

syndrome, post-traumatic stress disorder resulting from COVID, severe migraines, high blood pressure, thyroid, depression, reflex sympathetic dystrophy in right foot, heart palpitations, and irritable bowel syndrome. Tr. 222. The Commissioner denied Imhof's application initially and on reconsideration. Tr. 107, 113.

In December 2022, Imhof requested a hearing. Tr. 117. Administrative Law Judge ("ALJ") Rueben Shepard conducted a telephonic hearing in July 2023. Tr. 38. Imhof appeared, testified, and was represented by counsel at the hearing. *Id.* Qualified vocational expert Deborah Dutton-Lambert also testified. Tr. 65. In August 2023, the ALJ issued a written decision, which found that Imhof was not entitled to benefits. Tr. 10.

In October 2023, Imhof appealed the ALJ's decision to the Appeals Council. Tr. 197. In July 2024, the Appeals Council denied Imhof's appeal, Tr. 1, making the ALJ's August 2023 decision the final decision of the Commissioner, Tr. 10, *see* 20 C.F.R. § 404.981.

**Evidence**[2]

*1. Personal, Educational, Vocational Evidence*

Imhof was born in 1974, making her 46 years old on the alleged onset date. *See* Tr 313. She completed 11th grade and previously worked in retail as a salesperson and sales manager. *See* Tr. 223–24, 313.

---

[2]    The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs.

### 2. *Medical Evidence*

In April 2021, pulmonologist Niraj Niraula, M.D., treated Imhof via a telehealth appointment. Tr. 1039. Imhof reported contracting COVID in February 2021 and described recurrent loss of smell, dizziness, and ringing in her ears, but she stated that "the most bothersome symptom at this time is memory loss." *Id.* Imhof denied headaches or weakness in her arms or legs. Tr. 1040. She also reported no confusion, hallucinations, or sleep disturbances, but she was "nervous/anxious." *Id.* Dr. Niraula did not perform a physical examination. Tr. 1041.

In a July 2021 follow-up appointment with Dr. Niraula, Imhoff again denied headaches or any weakness in her arms and legs. Tr. 1008.

In August 2021, cardiologist Grace Ayafor, M.D., treated Imhof for post-COVID symptoms. Tr. 996. Dr. Ayafor described Imhof's cardiovascular workup as "unrevealing" and her echocardiogram as normal. *Id.* Imhof had a normal gait and no musculoskeletal deficiencies. Tr. 998.

Also in August 2021, James Bavis, M.D., saw Imhof to address complaints of migraines. Tr. 989. She reported that she experienced 12 migraines monthly, but that Nurtec helped with her migraines. Tr. 990. She denied any gait issues. *Id.* Imhof's motor strength, tone, gait, station, and coordination were all normal. Tr. 991–92.

3

In October 2021, Dr. Bavis noted that Imhof reported 12 to 16 headache days per month. Tr. 959. Imhof had been treated with Aimovig[3] and reported that although she tolerated the medication, it had not improved her condition. *Id.* Imhof described memory issues, trouble with word finding, and "feeling desperate." *Id.* Dr. Bavis recommend that Imhof continue with Aimovig treatments for her migraines and referred Imhof for a neuropsychological evaluation for persistent memory loss and to speech pathology for fluency issues. Tr. 965.

November 2021 physical therapy assessment notes from Dr. Bavis described Imhof with significant anxiety about testing and that she required reassurance and encouragement to tolerate certain maneuvers. Tr. 648. Imhoff described a "stretching sensation" during testing and lightheadedness with prolonged positioning. Tr. 647. Dr. Bavis noted that Imhof experienced "brief vertigo upon returning to [a] seated position" during her treatment. Tr. 648. Dr. Bavis remarked in the "Response to Evaluation" portion of his notes that he believed Imhoff "is limited in her ability to perform [activities of daily living] and work tasks [due to] fatigue and cervical/headache pain, and has difficulty [with] positional changes [due to] dizziness." *Id.*

---

[3]     According to the product's website website, Aimovig is a monthly, at-home,        injectable       migraine       medication. https://www.aimovig.com/start/aimovig-injection        [https://perma.cc/D8H9-F6FQ].

In January 2022, psychologist Leslie Zaynor, Ph.D., began treating Imhof. Tr. 1549. Imhof felt that she was "not the same person" and reported emotional symptoms of frustration, sadness, fatigue, hopelessness, and withdrawal after contracting COVID two times. *Id.* Dr. Zaynor reported that Imhof was oriented, healthy looking, made good eye contact, exhibited good insight and judgment, had average intelligence, and had intact memory and cognition. Tr. 1551–52. Imhoff "appeared relatively stable, her mood seemed highly anxious as evidenced by frequent head-nodding and constant shaking of her leg." Tr. 1552. Dr. Zaynor recommended cognitive behavioral and dialectical behavioral therapy to increase Imhof's skills for managing her mood. *Id.*

In January 2022, Imhof followed-up with Dr. Bavis regarding her migraines. Tr. 931. Imhof reported three to four headaches per week and that, although treatment with Emgality was approved, Imhof could not afford the co-pay. Tr. 932. She described dizziness, neck pain, and poor sleep. Tr. 932. Imhof also reported that she was being treated for post-traumatic stress disorder and that she experienced unexplained buzzing in her palms and the bottoms of her feet. *Id.* On examination, Imhof had normal speech, language, concentration, memory, and fund of knowledge. Tr. 933. Dr. Bavis noted that Imhof was "negative for agitation, behavioral problems, decreased concentration, sleep disturbance and suicidal ideas." *Id.*

In January 2022, Arsal Ahmad, M.D., treated Imhof for her complaints of body pain. Tr. 493. Dr. Ahmad observed pain in all 18 fibromyalgia tender points and concluded her symptoms were "consistent with fibromyalgia, likely secondary to her post Covid condition." Tr, 494.

In February 2022, Katelyn Fortunato, MA, LPC, drafted a letter detailing her ongoing bi-weekly treatment of Imhof for major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. Tr. 489. Fortunato detailed that she began treating Imhof in October 2021, after Imhof was diagnosed by the Cleveland clinic with "long-haul Covid." *Id.* Imhof's symptoms included overwhelming anxiety, regular panic attacks, loss of interest in things she loved, worry, and an inability to be in public. *Id.* Fortunato reported that Imhof followed a treatment plan to minimize her anxiety and traumatic symptoms and showed moderate progress. Tr. 490. Fortunato concluded that Imhof has shown "moderate progress" and "deeply wants to return to her normal life, but has a long road before being able to." *Id.* Fortunato issued a similar letter in April 2022, in which she stated that she "believe[d] [Imhof] is still unable to work due to PTSD, Major Depressive Disorder, and Generalized Anxiety Disorder." Tr. 1255–56.

In March 2022, during an unremarkable examination conducted by a nurse at Summa Health Medical Group, Imhof reported continued headaches but stable symptoms. Tr. 582–84. Imhof confirmed that for the previous 13 months, she had been suffering symptoms including dizziness, tinnitus,

palpations, insomnia, and fatigue without change. Tr. 583. She also expressed a desire to improve her situation and become better once again, as she felt that she was a burden to her family. Tr. 583.

In March 2022, Dr. Bavis administered Botox injections to Imhof's neck and skull muscles as treatment for Imhof's migraines. Tr. 920.

Also in March 2022, Jovan Laskovski, M.D. assessed Imhof regarding complaints of right hip pain. Tr. 855. She reported moderate levels of right hip pain, which worsened with walking, uneven ground, and stairs. Tr. 855. Imhof recounted one and a half months of relief following injection therapy in December 2021, but otherwise treated her pain with anti-inflammatory medications including Ibuprofen and Motrin. *Id.* On examination, Imhof had an antalgic gait and edema on her right side. Tr. 856. She showed tenderness to palpation in various areas on her right side, as well as some decreased range of motion on that side. Tr. 858. Impingement signs and flexion, abduction and external rotation testing were positive on the right side. *Id.* Dr. Laskovski indicated that Imhof had a large defect in the posterior hip and referred her to another physician to discuss a total hip arthroplasty. *Id.* That same month, Imhof received injection therapy in her right hip. Tr. 900.

And, in March 2022, a nerve conduction study and electromorphic testing revealed normal findings. Tr. 2973–74.

In June 2022, Arsal Ahmad, M.D., conducted a follow-up appointment to address Imhof's right foot pain. Tr. 1566. She described continued "severe

right foot pain, aching, burning and stabbing" that "continues to radiate above the ankle." *Id.* Although she reported that her pain was constant, she had "[g]ood relief with [her] current medications" including ">50% relief with each dose without side effects." *Id.* Dr. Ahmad remarked that Imhof appeared anxious but exhibited normal behavior and appropriate affect. Tr. 1567. He observed allodynia[4] to light touch over Imhof's dorsal and plantar aspects of the foot and distal lower leg, as well as tenderness over the metatarsal heads, redness throughout the foot, and decreased sensation over lateral aspects of the foot. *Id.* Dr. Ahmad also reported diminished speed with sit-to-stand transfers, a right-sided limp, and that Imhof walked with an antalgic gait. *Id.* Dr. Ahmad continued Norco for Imhof's pain. *Id.*

In June 2022, Imhof participated in psychiatric treatment to address her mental health symptoms and medications. Tr. 2379. She reported the "worst brain fog" she had ever had, disorientation, continued headaches, and low quality of life. *Id.* She repeated herself constantly, and always reminded of this by her husband. *Id.* Imhof's provider noted PTSD symptomology related to her Covid diagnosis and treatment. Tr. 2381. Imhof's provider increased her medication dosages. Tr. 2386.

---

[4] Allodynia is pain resulting from a non-noxious stimulus to normal skin. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

In August 2022, Melissa Gelsomino, APRN,[5] PMHNP-BC,[6] treated Imhof in a follow-up psychiatry appointment. Tr. 2393. Imhof appeared fidgety, displayed an anxious and euthymic[7] mood, and consistent affect. Tr. 2394. Nurse Gelsomino noted that Imhof's thought content was notable for worries and that she described short- and long-term memory loss. *Id.* Imhof, though, reported crying less since her previous visit. Tr. 2393.

In September 2022, Imhof participated in a behavioral health appointment at which she was cooperative, friendly, and receptive with normal thought content, speech, and perception, and had intact short and long-term memory, normal impulse control, intact judgment, and strong insight. Tr. 2404.

In October 2022, Dr. Ahmad followed up with Imhof regarding continued right foot pain. Tr. 2619. She again described greater than 50 percent relief with the use of Norco pain medication, and noted that her activities of daily

---

[5] APRN is an abbreviation for Advanced Practice Registered Nurse. *Advanced Practice Registered Nurse (APRN)*, OhioAPRN.com, http://www.ohioaprn.com/what-is-an-aprn-.html [https://perma.cc/69UR-XX65]. CNP is an abbreviation for Certified Nurse Practitioner. *Id.*

[6] PMHNP-BC is the abbreviation for Psychiatric-Mental Health Nurse Practitioner, Board Certified. *Adult Psychiatric-Mental Health Nurse Practitioner Certification (PMHNP-BC)*, American Nurses Credentialing Center, https://www.nursingworld.org/our-certifications/adult-psychiatric--mental-health-np-renewal/ [https://perma.cc/R92F-HP4T].

[7] A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

living were improving. *Id.* Dr. Ahmad observed, among other details, Imhof's mild discomfort and anxious mood on examination. Tr. 2619–20. Imhof returned in December 2022 and reported some symptoms migrating up her leg and displayed similar objective signs on examination. Tr. 2622–24.

At an October 2022 follow up with Dr. Bavis, Imhof reported that Botox treatments for her migraines were "fabulous" and that they worked until late September 2022 when she experienced a bad headache after waking up from anesthesia following hernia surgery. Tr. 2415. Imhof's speech, language, memory, and fund of knowledge were normal. Tr. 2417. She had full motor strength and tone, no tremors, normal sensation in her arms and legs, normal gait and station, and asymmetrical deep tendon reflexes. Tr. 2417–18.

In November 2022, Imhof underwent a comprehensive diagnostic behavioral health assessment. Tr. 2663. She displayed appropriate appearance, cooperative attitude, restless motor activity, anxious mood, full and congruent affect, normal speech, appropriate but guilty thought content, normal perception, normal thought process, attention, and memory. Tr. 2668–69. She also had intact judgment and fair insight. Tr. 2668–69.

In January 2023, during a telehealth appointment, Imhof reported to a nurse at Summa Health that recent Botox injections were not effective. Tr. 2764. The nurse told Imhof to follow up in six months. Tr. 2767.

Also in January 2023, Imhof reported that she was recently diagnosed with COVID for a fourth time. Tr. 2652.

In April 2023, during a cognitive behavioral therapy session, Imhof had a cooperative attitude, an anxious mood, pressured speech, and obsessive thoughts with flight of ideas. Tr. 2632.

In April 2023, Dr. Ahmad noted that Imhof experienced continued, moderate pain in her ankle and leg. Tr. 2628. Her pain was constant, and, although she reported good relief with pain medications, it was still aggravated by various activities. *Id*. Imhof appeared to be in mild discomfort, had an anxious mood, and displayed allodynia to light touch over the foot, tenderness over the metatarsal heads, redness throughout the foot, and decreased sensation over the lateral aspect of the foot. Tr. 2629. As before, she was slow to transfer positions and displayed an antalgic gait with right-sided limp. *Id*.

In April 2023, Maria Lorenzo, APRN-CNP, treated Imhof in a follow-up pulmonology appointment. Tr. 2771. Imhof reported shortness of breath when walking long distances and a persistent cough. *Id*. She stated that she walked before her fourth bout of COVID, but "is unable to do that at this time." *Id*.

In May 2023, Dianne Kreptowski, DO, treated Imhof in a follow-up appointment for various conditions. Tr. 3033. Imhof reported a fever and lethargy, severe pain all over her body, shortness of breath and palpitations when walking, depression and anxiety, and pain with swelling in her extremities. Tr. 3036. Dr. Kreptowski noted that Imhof's right leg was swollen and red. *Id*. Dr. Kreptowski also remarked that Imhof appeared to be in moderate distress and chronically ill. Tr. 3037. Physical examination revealed

11

tenderness, abnormal motor strength, limited range of motion and tenderness in the right lower leg, redness from the foot through the knee that was painful to touch, and mild edema in the extremities. *Id.*

In June 2023, Fortunato provided a third letter that described her treatment of Imhof from October 2021 through October 2022. Tr. 2983. Imhof's counseling treatment focused on coping skills for her stress, pain, and anger. Tr. 2984. Fortunato detailed that at Imhof's last appointment, Imhof could only leave her home when it was necessary for medical treatment. *Id.* Fortunato remarked that Imhof "had shown minimal progress in relation to anxiety." *Id.* She concluded that report by noting that Imhof "is not able to work at this time." *Id.*

### 3. State Agency Reviewers

In May 2022, state agency reviewing physician Sarah Garon, M.D., found that Imhof was limited to lifting, carrying, and pulling 20 pounds occasionally and 10 pounds frequently, and further limited Imhof to standing or walking for no more than six hours and sitting for six hours out of an eight-hour workday. Tr. 82. Dr. Garon limited Imhof to frequent climbing of ramps or stairs, stooping, crouching and kneeling, and occasionally climbing ladders, ropes, or scaffolds. Tr. 83. Dr. Garon found that Imhof should avoid concentrated exposure to extreme cold, heat, and to "[f]umes, odors, dusts, gases, poor ventilation, etc." *Id.* Finally, Dr. Garon found that "[a]lthough the

[medically determinable impairments] are severe, they are not listing-level." Tr. 79.

In December 2022, state agency reviewing physician Steve McKee, M.D., affirmed Dr. Garon's findings. *See* Tr. 96–97, 101.

In May 2022, state agency reviewing psychologist Joseph Cools, Ph.D., found: mild limitations in Imhof's ability to understand, remember, or apply information; moderate limitations in her ability to understand, remember, or apply information; moderate limitations in her ability to interact with others, concentrate persist, or maintain pace; and, moderate limitations in her ability to adapt or manage herself. Tr. 80. Dr. Cools further found that Imhof could understand, remember, and carry out "complex work tasks"; maintain concentration, persistence, and pace to carry out complex tasks in a work setting which does not involve a fast-paced production demand; interact with others on a "brief, superficial basis"; "would do best with very infrequent contact with the general public"; could adapt to a work setting not involving a fast-paced production demands with infrequent changes in responsibilities and expectations; and would do best with few changes to work-assignments. Tr. 85–86.

In October 2022, state agency reviewing psychologist Leslie Rudy, Ph.D., generally affirmed Dr. Cools findings on reconsideration. Tr. 97–8. But Dr. Rudy found that Imhof was limited to "carrying out 1–4 step tasks," as opposed to "complex work tasks." *See* Tr. 84, 97–8.

13

*4. Hearing Testimony*

Imhof testified that she most recently worked as a manager at Macy's and that, in this role, she hired and fired people, opened and closed the store, "handled vault money replenishment" and did "[j]ust whatever a manager would do to run the store." Tr. 47. She stated that she interacted with the general public "[a]ll of the time." *Id.* Imhof similarly described her role as a front-end manager at Target, but with less lifting and "just kind of making [the store] run smoothly." Tr. 48. Imhof confirmed that in both positions, she spent most of her workday standing. Tr. 49.

Imhof explained that her "long hauler COVID" symptoms include shortness of breath that can come from nowhere, body pain, loss of smell, vomiting, tingling in her limbs, and headaches. Tr. 51. She stated that "had headaches before but never to the point where I now have injections in my head from it." *Id.* Mentally, Imhof described "crippling" anxiety to the point where she does not want to leave her house. Tr. 52. Imhof stated that her symptoms vary drastically from day to day, which she described as "almost like spin the wheel." *Id.* Imhof confirmed that her long haul COVID symptoms, in conjunction with her fibromyalgia pain, limited her ability to sit, stand, or walk for extended periods of time. Tr. 53.

Imhof testified that two to three times per week she suffers from migraines that cause sensitivity to light and sound. Tr. 55–6. Imhof said that Botox injection treatments worked "fairly well" for her migraines in the past, but that she regressed "five steps" after having COVD twice since those

injections. Tr. 56. Imhof stated that, since contracting COVID, she experienced heart palpitations, but that medical professionals have not found any issues with her heart. Tr. 57. Imhof testified that after an episode of heart palpitations, she will go to bed. *Id.* She also confirmed that, since contracting COVID, she has been diagnosed with Reynaud Syndrome. *Id.* Imhof described issues with concentrating, getting out of bed, and talking to others. Tr. 59–60. She also testified about post-COVID brain fog. Tr. 59–60. Imhof said she struggled to remember and complete tasks without becoming overwhelmed. Tr. 61. On good days she could participate in activities like laundry, dishes, cooking, and cleaning. Tr. 63.

### 5. *Vocational Expert Testimony*

Qualified vocational expert, Deborah Dutton-Lambert, testified that a hypothetical individual of Imhof's age, education, and work experience, with the same residual functional capacity ("RFC")[8] that the ALJ assessed for Imhof, could not perform Imhof's past-relevant work, but could perform other work in the national economy. Tr. 67–68. Dutton-Lambert clarified that if the hypothetical individual required over-the-shoulder supervision at all times while working, that requirement would be considered accommodated work

---

[8]    An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

activity, not competitive employment, and "preclude all work in the national economy." Tr. 69.

**ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

2. The claimant has not engaged in substantial gainful activity since January 11, 2021, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: Obesity; Long Haul Covid-19; Fibromyalgia; Raynaud's Syndrome; Raynaud's Syndrome; Complex Regional Pain Syndrome of the Right Foot; Right Hip Degenerative Disc Disease/Osteoarthritis; Cervicalgia; Benign Paroxysmal Positional Vertigo; Migraines; Depressive Disorder; Generalized Anxiety Disorder; and posttraumatic stress disorder (PTSD) (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: The claimant can occasionally operate foot controls. She can

frequently handle and finger bilaterally. She can occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can have no exposure to unprotected heights, hazardous machinery, or commercial driving. She should avoid concentrated exposure to humidity, extreme heat or cold, dust, odors, fumes, and pulmonary irritants. The claimant was limited to simple, routine tasks, but not at a production rate pace. She is limited to simple, work-related decisions. She is limited to frequent interactions with supervisors, co-workers, and the general public. She can tolerate few changes in a routine works setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 4, 1974, and was 46 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has a limited education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist int significant number sin the national economy

> that the claimant can perform (20 CFR 404.1569 and 404.1569a).
>
> 11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 11, 2021, through the date of this decision ( 20 CFR 404.1520(g)).

Tr. 12, 14, 16, 22, 23.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1.   Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2.   Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3.   Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.   What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.   Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*

*v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The Court should remand on Imhof's first issue*

Imhof first asserts that the ALJ's RFC determination amounts to a legal error and is unsupported by substantial evidence because the ALJ "failed to reject the opinions of the State agency medical consultants through legitimate

means." Doc. 7, at 13.[9] The Court interprets this as an argument that the basis for the ALJ's decision is not legitimate. Further, because Imhof focuses on the opinions of the state agency reviewing psychologists, *see id*. at 14–15, it is apparent that she is challenging the ALJ's mental RFC.

Imhof's argument is somewhat confusing, however, because she implies that the ALJ rejected the state agency consultants' opinions. But the ALJ found the state agency psychological consultants' opinions generally persuasive, albeit to varied degrees. *See* Tr. 21 (finding that the state agency psychological consultants' opinion on reconsideration was "slightly more persuasive than the initial application opinion"). Nevertheless, when crafting Imhof's mental RFC, the ALJ did not include all limitations included in the state agency psychological consultant's opinions. Specifically, the ALJ limited Imhof to "frequent interactions with supervisors, co-workers, and the general public," Tr. 16, but the state agency consultants found that Imhof could "interact with others on a brief, superficial basis." Tr. 85, 98.

As an initial matter, Imhof's argument rests on a flawed premise. She omits that "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's

---

[9]     The page numbers cited in relation to Doc. 7, Imhof's brief on the merits, refer to the ECF-generated page number at the top of each page.

limitations wholesale." *See Rogers v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (citation omitted).

Nonetheless, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. § 404.1520c(a), (c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 404.1520c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 404.1520c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 404.1520c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL

2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Imhof concedes that the ALJ discussed *consistency*, albeit not in a manner that Imhof deems sufficient. *See* Doc. 10, at 1. Indeed, in considering the state agency reviewers opinions, the ALJ found that limiting Imhof to "brief, superficial interactions" was "slightly more restrictive than the claimant's medical evidence supports." Tr. 21. Quoted more completely, the ALJ found that:

> The undersigned finds the reconsideration opinion slightly more persuasive than the initial application opinion. However, both consultants are acceptable medical sources with program knowledge, which personally reviewed the claimant's medical evidence. However, limiting the claimant to brief and superficial interactions with others, is slightly more restrictive than the claimant's medical evidence supports. At the claimant's appointments, mental status examinations showed the claimant to be cooperative, friendly, and receptive, which would be more consistent with frequent limitations with others.

Tr. 21 (citations omitted). So the ALJ discussed *consistency*, although he did not specifically use that word.

*Supportability* is another matter, however. The ALJ's decision contains no discussion of the *supportability* of the state agency reviewing psychologists' opinions. Tellingly, although the Commissioner cites the regulatory definition of *consistency* and argues that the ALJ discussed the issue, he says nothing about *supportability*, Doc. 9, at 11; he doesn't cite the regulatory definition or

claim that the ALJ discussed supportability, either explicitly or by implication. *See Cormany*, 2022 WL 4115232, at *3 (noting that an ALJ is not required to "specifically use the terms 'supportability' or 'consistency' in his analysis"). Importantly, the Court is not in a position to conjure an argument that the Commissioner could have but chose not to make. *See Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017). So it is undisputed that the ALJ failed to follow the regulation which required him to discuss the *supportability* of the state agency reviewing psychologists' opinions.

Given that "there is nothing the Court can construe as discussing supportability *and the Commissioner does not argue otherwise*," remand is required; "'without fuller explanation, this court cannot engage in meaningful review of the ALJ's decision.'"[10] *Reed v. Comm'r of Soc. Sec.*, No. 20-cv-02611, 2021 WL 5908381, at *6 (N.D. Ohio Dec. 14, 2021) (emphasis added) (citing *Todd v. Comm'r of Soc. Sec.*, No. 20-cv-1374, 2021 WL 2535580, at *8 (N.D. Ohio June 3, 2021)); *see Brittany D. o/b/o of J.L.J.D. v. Comm'r of Soc. Sec.*, No. 23-cv-1577, 2024 WL 3337773, at *6 (S.D. Ohio July 9, 2024) ("it is well settled that the ALJ's failure to discuss the supportability … requires remand")

---

[10]     The Commissioner does not argue that the ALJ's error is harmless. And given that the ALJ adopted limitations that were less restrictive than those proposed by the state agency reviewers, such an argument would likely not be successful. *See Jada H. v. Kijakazi*, No. 22-cv-00520, 2023 WL 10325777, at *7 (W.D. Ky. Nov. 28, 2023) ("Any error, however, is again harmless, because ALJ Wilkerson ultimately crafted an RFC more restrictive than what the State Agency physicians opined by crediting Claimant's subjective allegations that were supported by the record."), *report and recommendation adopted*, 22-cv-520, 2024 WL 659500 (W.D. Ky. Feb. 16, 2024).

(citations omitted), *report and recommendation adopted*, 2024 WL 3890744 (S.D. Ohio Aug. 21, 2024); *Lorie B. v. Comm'r of Soc. Sec. Admin.*, No. 22-cv-2632, 2023 WL 6318074, at *4 (S.D. Ohio Sept. 28, 2023) ("Without an articulation of whether the ALJ considered these opinions to be supported or not, the Court cannot trace the ALJ's path of reasoning.").

### 2. *Imhof has not shown that her headaches meet or equal a listing*

In her second argument, Imhof asserts that the ALJ erred at Step Three of the sequential analysis by failing to consider her migraine headaches under Listing 11.02B. Doc. 7, at 16. She argues that this was a legal error because she has "primary headache disorder" as described in Social Security Ruling 19-4p and the "ALJ's decision also reflects that 'migraines' were recognized as a severe impairment separate from other issues, such that there is no question whether [Imhof] suffers from a primary headache disorder." *Id*. at 17. In response, the Commissioner admits that "the ALJ did not expressly consider whether [Imhof's] headaches medical[ly] equaled Listing 11.02" but asserts that "his decision is supported by substantial evidence" because there is no substantial question that she met or medically equaled that listing. Doc. 9, at 7–8.

At Step 3 of the disability evaluation process, a claimant will be found disabled if his or her impairments meets or equal one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that any condition meets or equals a listing. *Thacker v.*

*Soc. Sec. Admin.*, 93 F. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the medical equivalent of a listing[.]" *Id.* There is no heightened articulation standard at step 3. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Regulations mandate that an ALJ find a claimant disabled if she meets a listing. *Sheeks v. Commissioner of Soc. Sec. Admin*, 544 F. App'x 639, 641 (6th Cir. 2013). But the regulations do not require an ALJ to discuss every listing. *Id.* Instead, an ALJ must only discuss a particular listing if "the record 'raise[s] a substantial question as to whether the claimant could qualify as disabled' under [that] listing." *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *Tina M. S. v. Comm'r of Soc. Sec.*, No. 1:22-cv-236, 2023 WL 2788830, at *4 (S.D. Ohio Apr. 5, 2023) ("Where an ALJ does not discuss a Listing, the Court 'must determine whether the record evidence raises a substantial question as to [a claimant's] ability to satisfy each requirement of

the listing.") (citing *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 433 (6th Cir. 2014)). The "rais[ing] a substantial question" threshold in *Sheeks* applies when the ALJ doesn't consider a particular listing at all, and the claimant alleges that the ALJ's failure to do so was erroneous. *See* 544 F. App'x at 641.

So the Court must assess whether Imhof has shown that the record raises a substantial question that she could satisfy each requirement of Listing 11.02B. If she has, then it was an error that the ALJ did not discuss it. Importantly, Imhof must "do more than show that the ALJ's decision leaves open the question whether [she] meets the listing[.] [She] must show that the open question is a substantial one that justifies remand." *Sheeks*, 544 F. App'x at 641–42.

Social Security Ruling 19-4p establishes how primary headache disorder may be established as a medically determinable impairment and how claims involving primary headache disorders are considered. Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019). It provides as examples of primary headache disorders: "migraine headaches, tension-type headaches, and cluster headaches." *Id.* Ruling 19-4p also explains how to evaluate whether a medically determinable impairment of primary headache disorder should be evaluated under the Listing of Impairments. *Id.* at *7. It provides that Listing 11.02, related to epilepsy, "is the most closely analogous listed impairment for an MDI of primary headache disorder." *Id.*

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: [1] A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); [2] the frequency of headache events; [3] adherence to prescribed treatment; [4] side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and [5] limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* (enumeration added).

Here, Imhof makes at least some argument that each element of Listing 11.02 was shown in the record such that there is a substantial question about whether she could meet each listing. Each argument, however, is either not properly presented or fails to show that a significant question exists that she met the Listing requirements.

As to the first requirement, Imhof argues that "the record contains 'a detailed description from an acceptable medical source' of the typical headache events and associated phenomena." Doc. 7, at 18. In support of her argument, Imhof cites the medical record. *Id.* She does not, however, cite medical evidence contained within her summary of the relevant medical evidence, as required by the Court's initial order. *See* Doc. 4, at 3–4 ("The Court will not consider

facts referenced in a party's argument unless those facts have been set out in the Facts section of the party's brief."). Even still, the record Imhof cites is simply an intake form from one of her providers, Dr. Bavis, that contains— among other details—a description of her headaches. *See* Tr. 2783—85. This description might, if it were properly presented, raise a question as to whether a typical headache event and her associated symptoms meet the first criteria under Ruling 19-4p. But this factor is just one of the five to be considered and it does not alone present a significant question as to whether her condition meets or medically equals Listing 11.02B.

As to the second requirement, Imhof asserts that, although her "headache frequency varies throughout the record, [it] is always significant enough to meet the listing." Doc. 7, at 18. In support, she cites reports of her severe headaches and migraines between mid-2021 through mid-2022. *Id.*, at 18. But Imhof does not cite anything to support her position that the frequency of headaches, which vary significantly, are "always significant enough to meet the listing." *Id.* Although the record indicates that she reported multiple headaches per week and multiple migraines per month, Imhof has not provided any case or regulation, or other authority, to support her position that this frequency of headaches raises a significant question that her condition meets the Listing criteria.

As to the third requirement, Imhof claims that her "headaches continued to a significant degree despite her adherence to Botox injections." *Id.*

at 18. In support, Imhof outlines her self-described relief and eventual decrease in efficacy of Botox injections to address her migraines. *See id.* at 18–19. The evidence cited, however, shows that she initially experienced significant improvement with her Botox injections. *See id.* at 18–19 (citing, for example, Tr. 2968, showing that Imhof "reported an initial marked improvement with Botox, but told Dr. Bavis that she was back to baseline in May after a tooth was pulled."). Additionally, the record shows, as the ALJ referenced, that she did experience some relief after receiving Emgality injections, but that her $50 copay was not affordable. *See* Tr. 18, 932. Imhof's list of medications indicate that she was prescribed monthly Emgality injections, *see* Tr. 585, 925, 932, but it is unclear whether she received them and, if so, what effect they had on her headaches. Imhof does not discuss what the apparently positive effect adherence to medication may have on her ability to demonstrate a significant question regarding this element to be considered in evaluating Listing 11.02B for primary headache disorder.

Imhof makes only a passing reference to the fourth requirement in conjunction with her discussion of the third requirement. She simply asserts that her Botox treatments were "in addition to failing various medications prior to Botox therapy." *Id.* at 19 (citing record evidence that she experienced intolerable side effects from the prescription medications: Nurtec, Ubrevly, and Triptans). As indicated in relation to the third element, however, treatment did not fail to treat her symptoms. Instead, it appears that copay costs were

prohibitive, and that the efficacy of certain prescriptions decreased over time. Again, Imhof does not address what effect this fact has on her ability to demonstrate a significant question exists.

As to the fifth requirement,[11] Imhof claims that she "described the impact of her migraines on her daily activities." *Id.*, at 19. In support of this requirement, however, Imhof points to only two portions of her hearing testimony, in which she described that her migraines "take[] [her] out" such that "she needs to go into her bedroom, put a cold pack eye shield to cover her eyes, and sit for hours at a time" as well as light and sound sensitivity, which, she said, made her headaches worse. *Id.* (citing Tr. 55–56). The ALJ found, however, that Imhof's subjective symptom complaints only partially persuasive. Tr. 17. The only evidence that Imhof cites in support of the fifth element is her testimony and she does not address what effect, if any, the ALJ's findings related to her subjective symptom complaints have on this Court's analysis of the fifth element.

In sum, Imhof discussed, at least in some regard, each of the requirements that Ruling 19-4p instructs should be considered in assessing whether someone meets or medically equals Listing 11.02B. She did not, however, craft a compelling argument that each element is met in her case

---

[11]    Because Imhof did not distinguish between the third and fourth requirements, she labeled the fifth requirement as the fourth. This numbering difference may be of little substantive importance, but it further demonstrates that Imhof did not sufficiently show that a substantial question exists as to each requirement.

such that a "substantial question" exists as to whether she would meet or medically equal Listing 11.02. *See Sheeks*, 544 F. App'x at 641–42.

In support of nearly all requirements, Imhof simply cites to her self-reported symptoms. *See e.g.*, Doc. 7, at 19 (citing her own testimony in support of the fifth requirement). This is similar to the evidence cited, and found unpersuasive, in *Sheeks*. There, the claimant pointed only to his self-reports of struggles in school and intellectual functioning, instead of any record evidence suggesting he had any trouble caring for himself or handling social situations before he was twenty-two. 544 F. App'x at 642. Here, as in *Sheeks*, Imhof has done no more than "leave[] open the question whether [s]he meets [the Listing]." But she needed to "show that the open question is a *substantial* one that justifies a remand." 544 F. App'x at 641–42 (emphasis in original). In other words, it is not enough to show that there might a "toehold in the record on an essential element of the listing." *Id.* at 642.

Additionally, as the Commissioner highlighted, "no medical source has indicated findings that would satisfy the severity requirements of any listed impairment and the state agency reviewing physicians explicitly found that [Imhof] did not meet or medically equal the requirements of any listed impairment." Doc. 9, at 8. And, although the ALJ found Imhof's migraines were a severe impairment, each of the state agency reviewers found her migraines were a non-severe impairment, Tr. 80, 93, and Dr. Garon found that none of her conditions were "listing-level," Tr. 79–80. These state agency findings

32

constitute substantial evidence. *See Kurman v. Kijakazi*, No. 1:20-cv-1837, 2022 WL 1067568, at \*7 (N.D. Ohio Jan. 13, 2022) ("There is ample case law concluding that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision") (collecting cases), *report and recommendation adopted*, 2022 WL 765072 (N.D. Ohio Mar. 14, 2022); *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (reversal is unwarranted when the ALJ's conclusion at step three is sufficiently supported by factual findings elsewhere in the decision). So, the ALJ's decision not to discuss Listing 11.02B is also supported by substantial evidence in the record that demonstrates Imhof's migraines do not meet or medically equal the listings requirements.

### 3. The ALJ did not err in considering Imhof's subjective symptoms

In her third issue, Imhof alleges that the ALJ improperly considered her subjective symptoms. *See* Tr. 7, at 20.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at \*4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than

medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

Imhof claims that "the ALJ failed to explain his determination in relation to Plaintiff's subjective complaints" Doc. 7, at 20. To this end, the Court notes that the ALJ's discussion of Imhof's subjective symptom complaints in relation to the medical evidence is minimal. But, although less than ideal, the discussion is sufficient for purposes of review.

Importantly, the ALJ framed his evaluation of the medical evidence with a summary stating that:

> The claimant alleged, in reports, disability due to Covid-19, fibromyalgia, fatigue syndrome, migraines, high blood pressure, thyroid issues, reflex sympathetic dystrophy of the right foot, heart issues, irritable bowel syndrome, posttraumatic stress disorder, and depression (Exhibit 2A). She reported difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, understanding, following instructions, and using her hands. She can lift up to 15 pounds on bad days. On bad days, she was not able to do anything, and can only sit and lay down. She is able to care for her personal hygiene, independently, with some modifications such as keeping her hair short, sitting in the tub to shave,

34

> and holding onto the sink while using the toilet. Daily, she is able to prepare quick and simple meals such as a bowl of cereal, sandwiches, or something microwaveable. Difficulties with memory and concentration make it difficult for her to handle her own finances and focus on things like television. Lack of concentration makes it hard to follow written and spoken instructions. The claimant reported difficulties with falling asleep and has constant nightmares (Exhibit 5E).

Tr. 17. Then the ALJ found that Imhof's medically determinable impairments "could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 17.

While there is not an isolated paragraph or side-by-side discussion of the ALJ's decision dedicated to comparing and contrasting Imhof's subjective symptoms with the medical evidence, the ALJ articulated what he viewed as the relevant subjective symptom complaints along with the relevant medical evidence and he concluded that the subjective severity of the former was not entirely supported by the latter. *See* Tr. 17–20. Additionally, throughout the ALJ's discussion of the medical evidence, he sporadically compared Imhof's statements with the medical evidence. For instance, the ALJ explained that Imhoff "reported a cough, but this was infrequent and non-productive," when discussing medical evidence of her respiratory issues. Tr. 19. Later, when discussing an evaluation addressing Imhof's "complained of memory loss and word-finding difficulties" the ALJ pointed out that of three words provided, one

35

of which being apple, "[s]he was able to remember apple after 30 minutes, [and] she was able to think about [it] and repeated all three of the objects." *Id.*

The ALJ further compared Imhof's reported symptoms with an evaluation of record when he described that "[s]he stated that she was no[t] crying as much while on Prozac, but she was still experiencing anxiety. However, her mental status examination was unremarkable, and her mood was noted to be calm and relaxed." Tr. 20. This commentary, using words like "but" and "however" demonstrate that the ALJ was connecting his recitation of the relevant medical evidence with his consideration of Imhof's subjective symptom complaints. Again, the ALJ could have been more explicit. The decision as a whole, however, shows that the ALJ did properly evaluate Imhof's subjective symptom complaints. *See* 20 C.F.R. § 404.1529(c); SSR 16-3p; *see also Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 527 (6th Cir. 2014) ("this Court reviews the record as a whole to determine whether the ALJ's decision is supported by substantial evidence").The ALJ described the relevant two-step analysis required by Ruling 16-3p. Tr. 17. So he was plainly aware of the relevant factors and, after describing the required analysis, the ALJ discussed nearly all of the factors, albeit without specifically stating each factor. *See* Tr. 16–20. For instance, the ALJ discussed Imhof's daily activities, her descriptions of pain or other symptoms, and what factors may aggravate those symptoms. *See* Tr. 17 (describing difficulty with physical movements, memory, and concentration and how each affects her ability to do activities like watch

television, cook, or attend to her personal hygiene). The ALJ also discussed Imhof's response to and her reported efficacy of prescribed medication. *See* Tr. 20 (explaining that Imhof stated she cried less while on Prozac, but that she still experienced anxiety and comparing that with her provider's mental status examination note that she was calm and relaxed).

Imhof also cites support for the proposition that an ALJ's "blanket assertion" that the claimant is simply not believable does not pass muster. Doc. 7, at 20. But the ALJ here didn't simply say that Imhof wasn't believable. Instead, the ALJ cited Imhof's testimony, stated that it was not fully supported by the record, and then proceeded to cite portions of the record that the ALJ identified as relevant. Tr. 17–20. Read as a whole, as it must be, the ALJ's decision is sufficient. For all of these reasons, the ALJ did not err in evaluating Imhof's subjective symptom complaints.

## Conclusion

For the reasons explained above, I recommend that the Court remand the Commissioner's decision.

Dated: March 18, 2025

           */s/ James E. Grimes Jr.*
           James E. Grimes Jr.
           U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).